IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 4, 2018

# IN RE  MASON C.

**Appeal from the Circuit Court for Greene County**
No. 17CV496        Beth Boniface, Judge

_____

## No. E2018-00535-COA-R3-PT

_____

Appellant/Mother appeals the termination of her parental rights to the minor child on the grounds of: (1) abandonment by failure to provide a suitable home, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); and (2) severe child abuse, Tenn. Code Ann. § 36-113(g)(9).  Mother also appeals the trial court finding that termination of her parental rights is in the child's best interest.  Because Appellee, Tennessee Department of Children's Services, does not defend the ground of abandonment by failure to provide a suitable home, we reverse the trial court's termination of Appellant's parental rights on that ground.  We affirm the termination of Appellant's parental rights on the sole ground of severe child abuse and on the trial court's finding that termination of her rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of right; Judgment of the Circuit Court
Reversed in Part, Affirmed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Whittney N.L. Good, Bulls Gap, Tennessee, for the appellant, Jessica C.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. Background

Mason C. was born in April 2016 to Jessica C. ("Mother," or "Appellant")[1]  On June 1, 2017, the Tennessee Department of Children's Services ("DCS," or "Appellee") received a referral alleging that Mother had brought Mason to the hospital for treatment of a skin infection.[2]  DCS was notified because Mother appeared intoxicated to the point that she was unable to stay awake.  Julie Lowry, the initial DCS casework, testified that, when she arrived at the hospital, Mother exhibited slurred speech and was unable to communicate for several hours.  When Ms. Lowry was able to interview her, Mother refused a drug test but admitted that she had used marijuana, suboxone, morphine, and methamphetamine within the last three months.  Mother subsequently agreed to a hair follicle test, and DCS also performed a hair follicle test on Mason.  These follicle tests were admitted as trial exhibits three (Mother) and four (Mason).  Mother tested positive for methamphetamine and amphetamines but did not have a prescription for either.  Mason tested positive for methamphetamine and marijuana.

On June 2, 2017, the Juvenile Court of Greene County entered an ex parte order granting custody to DCS on its finding that there was probable cause that Mason was dependent and neglected.  The juvenile court appointed an attorney for Mother and a guardian ad litem for the child.  Although the exact date is not clear from the record, after Mason was removed from Mother's custody, she went to a drug treatment facility in Knoxville.  However, in July 2017, she left the Knoxville facility and went to a rehabilitation program in Asheville, North Carolina.  She has remained in North Carolina since that time.

Following an adjudicatory hearing on October 17, 2017, the juvenile court entered an order, on November 7, 2017, finding that Mason was dependent and neglected due to severe child abuse.  Specifically, the juvenile court found that Mason "tested positive for methamphetamine in hair follicle drug screens, and that during that time the child had been in the care and control of [M]other."  Mother appealed the order to the Circuit Court for Greene County ("trial court").

On November 14, 2017, DCS filed a petition to terminate Mother's parental rights to Mason.[3]  As grounds, DCS averred: (1) abandonment by failure to provide a suitable home, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); and (2) severe child abuse, Tenn. Code Ann. § 36-113(g)(9).  The trial court heard the petition on February 26, 2018.  By order of March 19, 2018, the trial court terminated Mother's parental rights

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

[2] DCS has a history with Mother.  On DCS' petition, the Juvenile Court of Greene County terminated Mother's parental rights to an older child, Alexis C. by order of October 8, 2013.  Mother appealed the termination of her parental rights to Alexis C., and this Court affirmed the termination.  *In re Alexis C.*, No. E2013-02498-COA-R3-PT, 2014 WL 2917376 (Tenn. Ct. App. June 24, 2014).

[3] DCS also sought termination of Mason's father's parental rights.  Father and Mother's respective parental rights were terminated by the same order.  Father did not appeal.

on both grounds asserted by DCS and on its finding that termination of Mother's parental rights is in the child's best interest. Mother appeals.

## II. Issues

There are two dispositive issues, which we state as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds for termination of Appellant's parental rights.

2. If so, whether there is clear and convincing evidence to support the trial court's determination that termination of Appellant's parental rights is in the child's best interest.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. §§ 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. **Jones v. Garrett**, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Grounds for Termination of Parental Rights

As noted earlier, the trial court relied on the following statutory grounds in terminating Appellant's parental rights: (1) abandonment by failure to provide a suitable home; and (2) severe child abuse. In its response brief, DCS specifically states that "[t]he Department declines to defend the ground of abandonment for failing to establish a suitable home . . . ." Because DCS does not defend this ground, we reverse the trial court's termination of Appellant's parental rights on the ground of abandonment by failure to provide a suitable home. We now turn to address the remaining ground of severe child abuse.

Tennessee Code Annotated section 36-1-113(g)(4), provides that a parent's rights may be terminated when:

> (4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

As referenced in section 36-1-113(g)(4), Tennessee Code Annotated section 37-1-102(b)(22) defines "severe child abuse," in relevant part, as follows:

"Severe child abuse" means:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

In **In re Samaria S.**, 347 S.W.3d 188 (Tenn. Ct. App. 2011), *perm. app.* denied (Tenn. July 14, 2011), this Court discussed the "knowing" criterion set out at section 37-1-102(b)(22), to-wit:

The term "knowing" as used in Section 37-1-102(b)[(22)]is not defined by statute. "The words 'knowing' and 'knowingly' do not have fixed or uniform meanings," and "[t]heir meanings in particular cases vary depending on the context in which they are used or the character of the conduct at issue." *In re R.C.P.*, No. M2003-01143-COA-R3–PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004). In the context of the dependency and neglect statutes, the term has been described as follows:

> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly" when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re Caleb J.B.W*., No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5 (Tenn. Ct. App. July 14, 2010) (citing *In re R.C.P*., 2004 WL 1567122, at *7); *see also In re H.L.F*., 297 S.W.3d 223, 236 (Tenn. Ct. App.2009).

*In re Samaria S.*, 347 S.W.3d at 206.

In its order terminating Mother's parental rights, the trial court found, in relevant part, that

> Mother was aware of the consequences of using and exposing her child to illicit drugs. She admitted in court that she knew exposing her child to methamphetamine is a ground for the termination of her parental rights.

***

> [Mason's] hair follicles tested positive for methamphetamine and THC. Mother testified in Court that he was in her care and custody during the time of exposure. There was a four day period when Mother was incarcerated that she did not have physical custody of her son, but the positive drug screen for Mother leads this Court to the conclusion that he was exposed while in her care. . . . Mother actively used illicit drugs, including methamphetamine, while caring for her son even though her parental rights to her older daughter had been terminated due to drug use. Dr. Justin Jones, the child's treating physician, testified that the child was at risk for "tachycardia, arrhythmias, stroke, seizure disorder, sleep disturbance disorders, hallucinations, a whole gamut. . . . and then the longer effects which can affect development, including development delays, neuropsychiatric disorders, which aren't apparent until much later

on in life." Dr. Jones testified that the child would be screened for developmental delays at every physical exam because the child is at risk for developmental complications from the drug exposure.

Dr. Justin Jones, the child's pediatrician, testified that with the exception of "sleep disturbances," Mason has shown no adverse effects from his early drug exposure The fact that Mason has, to date, exhibited only relatively minor effects does not negate the trial court's finding that Mother severely abused him. As this Court has noted, ". . . the healthy development of the child . . . does not diminish the severity of the harm to which the child was exposed." *In re M.J.J.*, 2005 WL 873305, at *8. However, as set out in the trial court's findings, *supra,* Dr. Jones further testified as to the possible long-term effects of Mason's drug exposure. Dr. Jones did note that Mason has shown some aggressive tendencies, which may be related to the drug exposure. Dr. Jones states that he referred Mason to a childhood behavioral specialist, who can monitor these behaviors and intervene if necessary.

Concerning how Mason may have come to test positive for methamphetamine and marijuana, Dr. Jones states that

> [t]here are four main ways . . . One is direct ingestion, one is through skin contact, one is through inhalation of fumes and then the other is actually through like sweat and sebum of a user . . . . With the sweat and sebum, recent studies show that the peak is within, the peak contact time with someone who has used for like the contaminated hair sample would be within two hours of use up to a week long, but after a week it's no longer present.

During her testimony, Mother admitted to drug use while Mason was in her custody, to-wit:

Q. While you were in the hospital with [Mason], were you still suffering from drug addiction?

A. Yes.

Q. And what were you positive, what would you have been using at that time period.

A. I was using Suboxone, marijuana occasionally and then morphine when I didn't have Suboxone.

Q. On your hair follicle drug screen, it was positive for methamphetamine, had you recently used methamphetamine when that sample was taken . . .?

A. It was about 2 months before that.

Q. And were you aware that your child had also tested positive for methamphetamine?

A. I am now.

Q. So with respect to that, was he, were you his sole care giver during that period of time?

A. Yes.

                                        ***

Q. And no one else provided him care? You were the one that was responsible for him?

A. Yes, just I [sic].

Q. Okay. You previously had a child removed due to your methamphetamine use. Is that correct?

A. Yes. 5 years ago.

                                        ***

Q. So you were aware that using methamphetamine could be harmful to any children that you have?

A. Yes.

In the first instance, the "knowing" criterion is satisfied by Mother's own testimony that she was "aware that using methamphetamine could be harmful to any child you have." DCS has the burden to show that Mother's use of illicit drugs around Mason was "likely to cause [him] serious bodily injury." As discussed above, Mason's hair follicle test undisputedly revealed that he had ingested or absorbed methamphetamine and marijuana. Dr. Jones testified in great detail that ingestion of these drugs could cause immediate and/or long term injury to Mason. Specifically, Dr. Jones stated that the type of drug exposure Mason suffered may result in "tachycardia, arrhythmias, stroke, seizure disorder, sleep disturbance disorders, hallucinations, a whole gamut. . . . and then the longer effects which can affect development, including development delays, neuropsychiatric disorders, which aren't apparent until much later

on in life." Based on this evidence and the record as a whole, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of severe child abuse.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id.* at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id.* However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to the instant case, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child.
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and

- 8 -

stable manner

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R*., 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. §§ 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White*, 171 S.W.3d at 194.

In its order terminating Appellant's parental rights, the trial court made the following findings concerning Mason's best interest:

> It is in the child's best interests for termination of parental rights to be granted as to [Mother] because [she has] not made changes in [her] conduct or circumstances that would make it safe for the child to go home. On the day of trial, . . . [Mother] . . . was [not] ready to assume the care and control of the minor child. Mother does not have independent housing, has not shown any ability to maintain her sobriety outside of a half-way house setting, has not completed parenting classes, has not completed IOP and has precarious transportation with very little support in Asheville, North Carolina. . . . Despite repeated efforts, Mother has refused to return to Tennessee to cooperate with DCS to regain custody of her child. In spite of her refusal to accept services, DCS continues to provide Mother with therapeutic visits when she does come to Tennessee.
>
> ***
>
> Although Mother does visit with her child, she has never progressed past therapeutic visits. The child has a minimal bond with Mother. In an entire month, Mother sees the child only twice for an insufficient period of time. As would be expected, the child exhibits problematic behavior after visits with Mother.

It is in the child's best interests for termination of parental rights to be granted as to [Mother] . . . because there is no meaningful relationship between [her] and the child.

It is in the child's best interests for termination of [Mother's] parental rights . . . because changing caregivers at this stage in his life will have a detrimental effect on him. The child receives all of his needs from his pre-adoptive home. He has bonded with his foster parents who make sure that all of his medical, developmental and emotional needs are met. He is not bonded to his Mother . . . but he has a deep connection to the family that has cared for him since his removal.

It is in the child's best interests for termination of parental rights to be granted as to Mother because she has severely abused this child and the child's older sibling. Despite Mother's parental rights to her older daughter being terminate don October 16, 2013, partially due to methamphetamine exposure, she continued to participate in the dangerous conduct of illicit drug use after her son was born . . . . Mother exposed her second child to the dangers of methamphetamine with the full knowledge of the risks to her child. It is in the child's best interests for termination of her parental rights because she has not shown that she can independently restrain from abusing drugs, which renders her consistently unable to care for the child in a safe and stable manner.

The record supports the trial court's findings. In relevant part, Ms. Thomas testified:

Q. . . . [H]ow is [Mason] doing in this [foster] home.

A. He is doing well in this home.

Q. Is the child meeting his developmental milestones?

A. He is delayed in speech. We have Tennessee Early Intervention working with him . . . .

Q. And are the foster parents meeting his needs?

A. Yes. All of his medical and dental are up to date.

Q. And they are also engaging with these services . . . in order to address the special needs that he has?

A. Yes. . . . He still has some behaviors. But he is doing a lot better. He has, after he has his visits with his mother, he has some temper tantrums

and he is, it is emotionally hard on him. And so we have to kind of, he gets very clingy and wanting to attach to the foster parents, and he cries.

Ms. Thomas further testified that Mother's visits were sporadic and dependent on whether she could get transportation from Asheville. Ms. Thomas stated that, since the filing of the petition to terminate her parental rights, Mother has visited Mason three times. However, Ms. Thomas noted that, despite these occasional visits, there is no meaningful relationship between Mother and Mason, but he has "established and developed a bond with the foster parents." Ms. Thomas opined that a change in Mason's current environment would likely cause the child emotional and psychological harm because "he has found structure and is stable in his foster home, and to go back to his mother to where there is no stability . . . would be very detrimental to him." Likewise, Dr. Jones testified:

Q. So in your opinion [Mason] being removed from that home, is that better for his health?

A. If active meth exposure was occurring in front of him, yes.

Q. And stopping the exposure at this point, does that give him a better prognosis for the future if we limited the exposure?

A. Absolutely.

Q. And why would that be?

A. Because he is still in a stage of development where he's not even yet two years old. Everything is still growing inside his body. His brain is still developing and naturally any time you have exposure to toxic substances it can affect those adversely and removing those toxic substances from potential exposure can improve outcome.

Q. So if he's not exposed from henceforth he has a better opportunity to have his brain develop naturally and normally?

A. Yes, ma'am.

From our review of the record, it is clear that Mason is doing well in his foster home. He is being seen regularly by his doctors, who will monitor him for any sign of further adverse effects from his early drug exposure. As discussed above, Mother's ability to care for Mason, while maintaining her sobriety, is untested. She is still in the early stages of her recovery. As Dr. Jones opined, to put Mason back in an environment where there is a significant risk he may again be exposed to drugs is simply too great a

risk to take. This is especially so in view of the fact that there does not appear to be a strong bond between Mother and Mason. Rather, the evidence shows that Mason has bonded with his foster parents and considers them to be his mother and father. To remove him from this stable environment would pose a risk for further psychological, emotional, or physical harm. Accordingly, we conclude that there is clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in the child's best interest.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's termination of Appellant's parental rights on the ground of abandonment by failure to provide a suitable home. We affirm the trial court's order terminating Appellant's parental rights to Mason C. on the sole ground of severe child abuse. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Jessica C. Because Jessica C. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE